# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD DELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0679-LWW |
| | ) | |
| GIGACQUISITIONS3, LLC, AVI | ) | |
| KATZ, RALUCA DINU, NEIL | ) | |
| MIOTTO, JOHN MIKULSKY, | ) | |
| ANDREA BETTI-BERUTTO, and | ) | |
| PETER WANG, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: September 23, 2022
Date Decided: January 4, 2023

Michael J. Barry, GRANT & EISENHOFFER, P.A., Wilmington, Delaware; Michael Klausner, Stanford, California; *Attorneys for Plaintiff Richard Delman*

John L. Reed, Ronald N. Brown & Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; Melanie E. Walker & Gaspard Rappoport, DLA PIPER LLP (US), Los Angeles, California; *Attorneys for Defendants GigAcquisitions3, LLC, Avi Katz, Raluca Dinu, Neil Miotto, John Mikulsky, Andrea Betti-Berutto & Peter Wang*

**WILL, Vice Chancellor**

Over the latter half of the 2010s, special purpose acquisition companies (or SPACs) became wildly popular investment vehicles. Successful SPACs are structured to create value for multiple participants. For private companies, SPACs provide an efficient path to access the public equity markets without a traditional initial public offering. The SPAC's management team (or sponsor) can obtain substantial profits on nominal invested capital. And the public stockholders who purchase the SPAC's units have a chance to invest early in an emerging company's lifecycle.

Because the ultimate investment opportunity is initially unknown, a SPAC's public stockholders rely on the entity's sponsor, officers, and directors to identify a favorable merger target. Public stockholders are given redemption rights, allowing them to reclaim their funds—held in trust—before a merger if they choose to forego investing in the combined company. For a SPAC organized as a Delaware corporation, stockholders are also assured that the entity's fiduciaries will abide by standards of conduct.

The plaintiff in this action asserts that the sponsor and directors of a SPAC failed to live up to those fiduciary obligations. The defendants allegedly undertook a value destructive deal that generated returns for the sponsor at the expense of public stockholders. The plaintiff claims that the defendants impaired stockholders' ability to decide whether to redeem or to invest in the post-merger company. Public

1

stockholders were left with shares worth far less than the guaranteed redemption price; the sponsor received a windfall.

Barring legislation providing otherwise, the fiduciaries of a Delaware corporation cannot be exempted from their loyalty obligation and the attendant equitable standards of review that this court will apply to enforce it. That the corporation is a SPAC is irrelevant. Long-established principles of Delaware law require fiduciaries to deal candidly with stockholders and avoid conflicted, unfair transactions. Here, it is reasonably conceivable that the defendants breached those duties by disloyally depriving public stockholders of information material to the redemption decision. The defendants' motion to dismiss is therefore denied.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[1]

---

[1] Verified Class Action Compl. (Dkt. 1) ("Compl."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC.").

Citations in the form of "Defs.' Opening Br. Ex. __" refer to exhibits to the Unsworn Declaration of Kelly L. Freund to Defendants' Opening Brief in Support of Their Motion to Dismiss Verified Class Action Complaint. Dkt. 18.

## A.    Gig3's Formation and Sponsor

GigCapital3, Inc. ("Gig3" or the "Company")—now Lightning eMotors, Inc. ("New Lightning")—is a Delaware corporation formed as a special purpose acquisition company (SPAC) in February 2020.[2]

A SPAC is a financial innovation that traces its origins to the "blank check" companies of the 1980s.[3]  It is a shell corporation, most commonly incorporated in Delaware, that lacks operations and takes a private company public through a form of reverse merger.  The number of SPAC mergers skyrocketed in 2020 and 2021.[4] That trend has recently slowed.[5]

SPAC structures have become largely standardized.[6]  The SPAC is formed by a sponsor that raises capital in an initial public offering (IPO).  Its IPO units are customarily sold for $10 each and consist of a share and a fraction of a warrant (or

---

[2] Compl. ¶¶ 1, 35, 39.

[3] *Id.* ¶ 2; *see Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1189 n. 3 (Del. Ch. 2010) (discussing blank check companies as "common instruments of fraud in the 1980s") (citations omitted).

[4] Compl. ¶ 2; *see* Michael Klausner, Michael Ohlrogge & Emily Ruan, *A Sober Look at SPACs*, 39 Yale J. Reg. 228, 230-31 & 231 fig.1 (2022) (noting that in January 2020 through November 2021, SPAC IPOs accounted for more than half of total IPOs and, among all firms that went public, SPAC mergers accounted for 22% in 2020 and 34% in 2021).

[5] *See* Aziz Sunderji & Amrith Ramkumar, *SPAC Activity in July Reached the Lowest Levels in Five Years*, Wall St. J. (Aug. 17, 2022), https://www.wsj.com/articles/spac-activity-in-july-reached-the-lowest-levels-in-five-years-11660691758.

[6] Compl. ¶¶ 2-8; *see In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 793-96 (Del. Ch. 2022) (discussing typical SPAC structure).

3

alternatively a warrant to purchase a fraction of a share). The IPO proceeds are held in trust for the benefit of the SPAC's public stockholders, who have a right to redeem their shares after a merger target is identified. These redemption rights essentially guarantee public IPO investors a fixed return.

The sponsor, most often a limited liability company, is responsible for administering the SPAC. Sponsors are compensated by a "promote." Though that can take many forms, it is usually 20% of the SPAC's post-IPO equity—issued as "founder shares"—for a nominal price. The sponsor will also make an investment concurrently with the IPO to cover the SPAC's underwriting fees and other expenses, since those expenses cannot be paid using cash in the trust. At the time of its merger, a SPAC may also issue new shares as private investment in public equity (PIPE).

The SPAC's charter sets a fixed period—generally between 18 and 24 months—to complete a de-SPAC transaction with a yet-to-be-identified private company. The SPAC must liquidate if it fails to merge within that window. In the event of liquidation, the trust distributes its cash (IPO proceeds plus accrued interest) to the SPAC's public stockholders. The founder shares, meanwhile, become worthless.

Gig3 fell within these structural norms.

Its sponsor was defendant GigAcquisitions3, LLC (the "Sponsor"), a Delaware limited liability company.[7] The Sponsor was responsible for incorporating the entity, appointing its directors, and managing its IPO.[8]

In February 2020, shortly after it was incorporated, Gig3 issued founder shares to the Sponsor amounting to approximately 20% of Gig3's post-IPO equity for the nominal sum of $25,000.[9] This came to about five million founder shares, referred to as the "Initial Stockholder Shares," at a price of $0.005 per share.[10]

The Initial Stockholder Shares differed from those that would later be offered to the public. The Initial Stockholder Shares could not be redeemed and lacked liquidation rights.[11] They were also subject to a lock-up that prohibited the Sponsor from transferring, assigning, or selling the shares until a set time.[12]

---

[7] Compl. ¶¶ 4, 26.

[8] *Id.* ¶ 4.

[9] *Id.* ¶ 39; *see also* Defs.' Opening Br. Ex. 3 ("Prospectus") at 13-14.

[10] Compl. ¶¶ 7, 39. Specifically, there were 4,985,000 Initial Stockholder Shares. *See* GigCapital3, Inc., Definitive Proxy Statement (Amendment No. 3 to Form S-4) ("Proxy") at 5 (Mar. 22, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1802749/000119312521088347/d70436ds4a.htm.

[11] Compl. ¶ 8; *see also* Prospectus at 15, 26.

[12] Prospectus at 14-15.

## B.    Gig3's IPO

Gig3 completed its IPO on May 18, 2020, selling 20 million units to public investors at $10 per unit and raising proceeds of $200 million.[13] The units were offered pursuant to a Form S-1 Registration Statement, filed with the Securities and Exchange Commission (SEC) on February 25, 2020, and a May 13, 2020 prospectus.[14] The prospectus disclosed certain conflicting interests between the Sponsor and Gig3's public stockholders:

> Since our Sponsor will lose its entire investment in us if our initial business combination is not consummated, and our executive officers and directors have significant financial interests in our Sponsor, a conflict of interest may arise in determining whether a particular acquisition target is appropriate for our initial business combination.[15]

Each unit consisted of a share of common stock and three-quarters of a warrant to purchase a share of common stock at an exercise price of $11.50 per share.[16] The shares of common stock had redemption and liquidation rights. If Gig3 failed to complete a de-SPAC merger within 18 months, it would liquidate and public stockholders would receive their $10 per share investment back plus

---

[13] Compl. ¶ 40; *see also* Prospectus at 9.

[14] *See generally* Defs.' Opening Br. Ex. 5; Prospectus.

[15] Prospectus at 46.

[16] Compl. ¶ 40; *see also* Prospectus at 9.  For example, the warrants contained in four units would allow the holder to purchase three common shares at $11.50 per share.

interest.[17]  If Gig3 identified a target, public stockholders could redeem their shares for $10 per share plus interest but keep the warrants included in the IPO units.[18]  The warrants were essentially free for public IPO investors.[19]

The IPO proceeds were deposited in a trust.  The cash in the trust was earmarked for the exclusive purposes of redeeming shares in the first instance, contributing the remainder to a merger, or returning funds to stockholders in the event of a liquidation.[20]

Nomura Securities International, Inc. ("Nomura") and Oppenheimer & Co. Inc. ("Oppenheimer") acted as the joint lead book-running managers for the offering, and Odeon Capital Group LLC acted as co-manager.[21]  The underwriters agreed to defer two-thirds (or $8 million) of their underwriting fees until a merger was accomplished.[22]

---

[17] Compl. ¶ 4; *see also* Defs.' Opening Br. Ex. 9 ("Charter") § 9.1(b); Prospectus at 26.

It bears noting that the transaction discussed in this decision is technically a series of business combinations involving Gig3's merger subsidiary and the target, leading to the target becoming a subsidiary of Gig3.  *See* Proxy at A-13.

[18] Compl. ¶¶ 8, 40; *see also* Prospectus at 20.  Whole warrants became exercisable after the merger closed.

[19] Compl. ¶ 40.  In the event of a liquidation, the warrants would expire worthless.  In the event of a merger, public stockholders could redeem their shares—recouping the cost of purchasing IPO units—and retain the warrants.

[20] *Id.*

[21] Prospectus at Cover Page.

[22] Compl. ¶ 52.

Simultaneously with the IPO, the Sponsor purchased 650,000 Gig3 units for $10 per unit in a private placement.[23] The $6.5 million in proceeds were used to pay Gig3's underwriting fees and operating expenses.[24] The IPO underwriters also collectively purchased 243,479 private placement units for $10 per unit.[25] Like an IPO unit, each private placement unit consisted of a share of common stock and three-quarters of a warrant to purchase a share of common stock.[26] But unlike the IPO shares, the shares included in the private placement units lacked liquidation or redemption rights and were subject to a lock-up.[27]

### C. Gig3's Directors and Officers

Defendant Avi Katz is a "serial founder of SPACs" affiliated with GigCapital Global, where Katz is a founding managing partner, Chief Executive Officer, and Executive Chairman.[28] Katz served as a member of Gig3's Board of Directors (the "Board") and as Gig3's Executive Chairman, Secretary, President, and Chief

---

[23] *Id.* ¶ 41.

[24] *Id.*

[25] *Id.* ¶ 52; *see also* Prospectus at 110.

[26] Prospectus at 110.

[27] *Id.*; *see supra* notes 11-12 and accompanying text.

[28] *Id.* ¶¶ 6, 37; *see id.* ¶¶ 27-32 & ¶ 27 n.1; GigCapital, https://www.gigcapitalglobal.com (last visited Jan. 1, 2023).

Executive Officer.[29]  He held a controlling interest in the Sponsor and was its managing member.[30]

Katz, through the Sponsor, had the power to select Gig3's initial directors and officers.[31]  Katz appointed defendants Raluca Dinu (his spouse), Neil Miotto, John Mikulsky, Andrea Betti-Berutto, and Peter Wang to the Board.[32]  These individuals have prior ties to Katz, are associated with GigCapital Global, and have held multiple roles at GigCapital Global affiliated business.[33]

The directors also held membership interests of an undisclosed quantity or value in the Sponsor, which in turn held Gig3 Initial Stockholder Shares.[34]  In addition, Wang and Betti-Berutto were each given 5,000 Gig3 common shares as consideration for future services (the "Insider Shares").[35]  Like the Initial

---

[29] Compl. ¶ 27; *see* Prospectus at 109.

[30] Compl. ¶ 26; *see* Prospectus at 109 ("The shares held by our Sponsor are beneficially owned by Dr. Katz . . . who has sole voting and dispositive power over the shares held by our Sponsor.").

[31] Compl. ¶¶ 4, 6, 9.

[32] *Id.* ¶¶ 28-32.

[33] *Id.* ¶¶ 42-45; *see infra* notes 185-96 and accompanying text.

[34] Compl. ¶ 43.  Miotto held a 10% ownership interest in GigFounders, LLC, which held membership interests of an undisclosed quantity or value in the Sponsor.  *Id.*

[35] *Id.*; *see also* Prospectus at 14.  Non-party Brad Weightman, Gig3's Chief Financial Officer and Vice President, was likewise given 5,000 Insider Shares.  Prospectus at 14.

9

Stockholder Shares, the Insider Shares lacked redemption and liquidation rights and were subject to a lock-up restriction.[36]

### D. Lightning eMotors

After the IPO, Gig3's officers and directors began to search for a merger target. They identified Lightning eMotors Inc. ("Lightning"), an electric vehicle manufacturer focused on zero-emission medium duty vocational vehicles and shuttle buses.[37] Katz and Dinu "dominated" the Company's negotiations with Lightning.[38]

Oppenheimer and Nomura—two of the three IPO underwriters—were hired to serve as Gig3's financial advisors.[39] The Board did not ask Oppenheimer or Nomura to provide a fairness opinion on the merger.[40]

On December 9, 2020, the Board approved a proposed transaction with Lightning.[41] The next day, Gig3 and Lightning announced that they had entered into a merger agreement.[42] The merger agreement provided that Lightning stockholders would receive consideration in the form of Gig3 common shares plus a right to

---

[36] *See* Prospectus at F-8; *supra* notes 11-12 and accompanying text.

[37] Compl. ¶ 65; *see also* Proxy at 244.

[38] Compl. ¶ 51.

[39] *Id.* ¶ 52.

[40] *Id.* ¶ 53.

[41] *Id.* ¶ 17.

[42] *Id.* ¶ 46.

receive additional shares in an earnout.[43]  Upon the completion of the transactions contemplated by the merger agreement, Gig3 would change its name to New Lightning and its common stock would trade on the New York Stock Exchange under the symbol "ZEV."[44]

### E.    PIPE and Convertible Note Financing

At the same time that it announced the proposed merger, Gig3 entered into a PIPE subscription agreement and a convertible note subscription agreement.  Both agreements were contingent on the merger closing.[45]

Gig3 met with 46 potential PIPE investors, hoping to raise between $100 million and $150 million in PIPE financing at $10 per share based on a $899 million valuation of Lightning's equity.[46]  Initial feedback indicated that Gig3 would have to improve the share exchange (that is, reduce the valuation of Lightning) to justify a $10 investment in common stock.[47]  Lightning's valuation was then lowered to $539 million to support a PIPE financing of at least $75 million.[48]  Gig3 ultimately

---

[43] *Id.*

[44] Proxy at Cover Page.

[45] Compl. ¶ 47.

[46] *Id.* ¶ 61; Proxy at 151.

[47] Compl. ¶ 61.

[48] Proxy at 152.

raised $25 million in PIPE financing from a single investor, who "was the largest owner of Lightning's pre-merger equity."[49]

With the failure of the PIPE, Gig3 pursued a dilutive convertible debt financing.[50] It entered into an agreement with 30 undisclosed investors—20 of whom had declined to participate in the PIPE—for the purchase of convertible notes (the "Notes") at an aggregate price of $100 million.[51] The Notes have a three-year term and accrue 7.5% interest annually.[52] They are convertible into 8,695,652 shares of Company common stock at a conversion price of $11.50 per share.[53] Under the terms of the convertible note subscription agreement, if the conversion right is exercised before the Notes mature, the Company is responsible for future interest payable on the Notes.[54] The Note holders also received—at no additional cost—

---

[49] Compl. ¶ 61.

[50] *Id.* ¶ 62; *see also* Proxy at 154.

[51] Compl. ¶¶ 47-48, 62; *see also* Proxy at 2, 156-57.

[52] Compl. ¶ 47.

[53] *Id.* New Lightning has the option to force conversion after one year if Gig3's stock price exceeds $13.80 per share for 20 out of 30 trading days. *Id.*

[54] *Id.* ¶ 47 & n.2. For example, assume New Lightning's stock price was $14 per share at the end of year one. If the conversion right was exercised, the Note holders would receive nearly $15 million in cash (from the future interest payable for the two remaining years), plus 8,695,652 shares worth $14—for a price of $11.50. In total, the Note holders would gain $36,114,130. That is a $2.50 per share profit times 8,695,652 shares, plus 23/24 of $15 million in remaining interest. *Id.*

8,695,652 warrants to purchase common stock at an exercise price of $11.50 per share.[55]

## F.     The Proxy

Gig3's definitive proxy statement (the "Proxy") was filed with the SEC on March 22, 2021.[56] The Proxy informed stockholders that a special meeting would be held on April 21.[57] Stockholders were invited to vote on the Lightning merger and related transactions, including the PIPE and convertible note financings.

Stockholders were also informed that the deadline to exercise their redemption rights was April 19—two business days before the special meeting.[58] They were reminded that redeeming would entitle them to "approximately $10.10

---

[55] *Id.* ¶ 48.  Continuing the example in footnote 54, if the Note holders exercised their warrants along with their conversion rights, they would receive a profit of $2.50 on another 8,695,652 shares—for an additional profit of $21,739,130 and a total profit of $57,853,260. *Id*.  That would equate to approximately a 58% return over one year on the $100 million investment.  *Id.*

[56] *Id.* ¶ 49.

[57] Proxy at Cover Page.

[58] Compl. ¶ 49; *see also* Proxy at 25.

per share" from the trust.[59]  The Proxy emphasized that "[p]ublic stockholders may elect to redeem their shares even if they vote for the [merger]."[60]

The Proxy indicated that the merger consideration to be paid to Lightning stockholders consisted of Gig3 stock valued at $10 per share.[61]  It defined "Aggregate Closing Merger Consideration" to mean "a number of shares of [Gig3] Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value divided by (b) $10.00."[62]  The Proxy also disclosed a general risk of dilution caused by the merger and related transactions, including the PIPE financing and the Notes.[63]

---

[59] Proxy at Cover Page, 3, 23-24.  The Proxy also warned that there could be insufficient funds to pay redemptions if a third party brought a claim that the Sponsor was unable to indemnify.  Compl. ¶¶ 88-91; *see also* Proxy at 81, 84.  The Proxy explained "[t]he Sponsor may not have sufficient funds to satisfy its indemnity obligations" because Gig3 "ha[d] not asked the Sponsor to reserve for such indemnification obligations."  Compl. ¶ 90 (quoting Proxy at 84).  The plaintiff alleges that the likelihood of the SPAC being unable to satisfy redemptions was extremely low; public sources indicate it has never occurred.  *Id.* ¶¶ 90-91.

[60] Proxy at Cover Page, 23, 123.  As a practical matter, because the record date was March 15, 2021, public stockholders could elect to redeem their shares and then vote at the April 21 special meeting.  *See id.* at 19.

[61] *Id.* at Cover Page, A-14.

[62] *Id.* at Cover Page, A-2.  "Aggregate Closing Merger Consideration Value" was equivalent to the valuation of Lightning equity ($539 million) adjusted for Lightning's outstanding options, debt, and cash.  *Id.*; *see id.* at 152.

[63] *E.g.*, *id.* at 14, 87 ("Warrants will become exercisable for our Common Stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders."), 94 ("Our public stockholders will experience dilution as a consequence of [the merger and related transactions].").

14

Gig3's Proxy contained projections prepared by Lightning management that forecast dramatic growth over the next five years. From 2020 to 2025, Lightning's revenues were predicted to rise from $9 million to more than $2 billion and its annual gross profits would grow from zero to more than $500 million.[64] The Lighting management projections reported to stockholders in the Proxy were as follows:[65]

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $9 | $63 | $354 | $640 | $1,165 | $2,012 |
| *Gross Growth* | *NM* | *NM* | *462%* | *81%* | *82%* | *73%* |
| Gross Profit | $0 | $9 | $68 | $140 | $296 | $528 |
| *Gross Margin* | *3%* | *14%* | *19%* | *22%* | *25%* | *26%* |
| EBITDA | ($11) | ($17) | $15 | $50 | $155 | $315 |
| *EBITDA Margin* | *(122%)* | *(27%)* | *4%* | *8%* | *13%* | *16%* |

$ values are in millions.

In 2019 and 2020 combined, Lightning delivered 97 vehicles and built an additional 12 demonstration and test vehicles.[66] The Proxy stated that Lightning would "expand[] its production facility by roughly 107,000 square feet to prepare for capacity expansion to 3,000 vehicles per shift per year" from its current capacity of 500 vehicles per shift per year.[67] It explained that Lightning had built "a complete

---

[64] Compl. ¶¶ 65-66; Proxy at 164.

[65] Compl. ¶ 65; Proxy at 164.

[66] Compl. ¶ 67.

[67] Proxy at 161; *see also* Compl. ¶¶ 68, 69 (quoting Proxy at 253).

modular software and hardware solution" that "broaden[ed] and strengthen[ed]" its access to a $67 billion total addressable market.[68]

Finally, the Proxy disclosed potential conflicts of interest between Gig3's Sponsor and Board, on one hand, and its public stockholders, on the other. One such conflict was caused by "the fact that [the] Sponsor, officers and directors w[ould] lose their entire investment in [Gig3] and w[ould] not be reimbursed for any out-of-pocket expenses if an initial business combination [wa]s not consummated by the applicable deadline."[69]

Approval of the merger required the affirmative stockholder vote of a majority of the votes cast at the special meeting.[70] Stockholders overwhelmingly approved the transaction, with more than 98% of the votes cast being in favor.[71] Approximately 29% of public stockholders elected to redeem 5.8 million shares.[72]

### G. Post-Merger Performance

On May 6, 2021, a merger subsidiary of Gig3 merged with and into Lightning, with Lightning surviving the merger.[73] Upon closing, Gig3 changed its name to

---

[68] Proxy at 246; *see also* Compl. ¶ 68.

[69] Proxy at 5; *see also supra* note 15 and accompanying text.

[70] Proxy at Cover Page.

[71] Compl. ¶ 50; *see also* Defs.' Opening Br. Ex. 6 ("April 21, 2021 Form 8-K") at Item 5.07.

[72] Compl. ¶ 50.

[73] *Id.* ¶ 36; *see also* Defs.' Opening Br. Ex. 1 ("May 6, 2021 Form 8-K") at Item 2.01.

Lightning eMotors, Inc.[74] New Lightning subsequently elected a nine-member board of directors, which included Miotto, Dinu, and Katz.[75]

Before the vote, Gig3's stock price had traded around the redemption price, closing at $10.07 on April 15.[76] By the May 6 closing date, Gig3's stock price had fallen to $7.82 per share.[77] Still, the Initial Stockholder Shares were worth more than $39 million when the merger closed.[78]

On May 17, New Lightning issued a press release announcing its first quarter 2021 financial results and 2021 projections.[79] It announced quarterly revenues of $4.6 million and reduced its 2021 revenue guidance, stating that projected 2021 revenues would "be in the range of $50 million to $60 million."[80] Taking the midpoint ($55 million), this was a 12.7% downward revision from the projection in the Proxy.[81]

---

[74] Compl. ¶ 1; *see also* May 6, 2021 Form 8-K at Item 2.01.

[75] Compl. ¶ 11; *see also* May 6, 2021 Form 8-K at Item 5.02.

[76] Compl. ¶ 92.

[77] *Id.* ¶ 93.

[78] *Id.* ¶ 96.

[79] *Id.* ¶ 72.

[80] *Id.*

[81] *Id.* ¶ 73; *see supra* note 65 and accompanying text (noting that the 2021 projection was $63 million).

By August 2, Gig3's stock price had fallen to $6.57 per share.[82]  As of the day before this opinion was filed, trading closed at $0.41 per share.[83]

## H.  This Litigation

Plaintiff Richard Delman has held stock in Gig3 since August 26, 2020.[84]  On August 4, 2021, he filed a putative class action Complaint on behalf of himself and current and former Gig3 stockholders.[85]

His Complaint advances three claims.  Count One is a direct claim for breach of fiduciary duty against the six members of the Gig3 Board.[86]  Count Two is a direct claim for breach of fiduciary duty against Katz and the Sponsor as the controlling stockholders of Gig3.[87]  Count Three is a direct claim for unjust enrichment against the Sponsor and the director defendants.[88]

---

[82] Compl. ¶ 94.

[83] NYSE, Lightning eMotors Incorporated (ZEV), https://www.nyse.com/quote/ZEV (last visited Jan. 3, 2021).

[84] Compl. ¶ 25.

[85] *Id.* ¶¶ 99-107.

[86] *Id.* ¶¶ 108-15.

[87] *Id.* ¶¶ 116-24.

[88] *Id.* ¶¶ 125-28.

18

The defendants moved to dismiss the Complaint on August 31, 2021.[89]

Briefing was completed on March 1, 2022.[90] I heard oral argument on the motion to dismiss on September 23.[91]

## II. LEGAL ANALYSIS

The defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

The standard that governs a motion to dismiss under Rule 12(b)(6) is well settled:

> (i) all well-pleaded factual allegations are accepted as true;
> (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[92]

The "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal.'"[93]

The "reasonable conceivability" standard a plaintiff must meet to survive a Rule

---

[89] Dkt. 8.

[90] *See* Dkt. 31. This matter was reassigned to me on August 1, 2022. Dkt. 36.

[91] Dkts. 38, 39.

[92] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[93] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)).

12(b)(6) motion asks only "whether there is a 'possibility' of recovery."[94] I "must draw all reasonable inferences in favor" of the plaintiff but am "not required to accept every strained interpretation of the [plaintiff's] allegations."[95]

The plaintiff's breach of fiduciary duty claims are akin to those considered by this court in *In re MultiPlan Corp. Stockholders Litigation*.[96] There, the defendants undertook a value-decreasing de-SPAC merger that allegedly benefitted them to the detriment of public stockholders for whom liquidation would have been preferable. The defendants were purportedly incentivized to minimize redemptions to secure significant returns for themselves. The claim recognized in *MultiPlan* was that "the defendants' actions—principally in the form of misstatements and omissions—impaired public stockholders' redemption rights to the defendants' benefit."[97]

The plaintiff here likewise alleges that the defendants breached their fiduciary duties by "prioritizing their own financial, personal, and/or reputational interests [in] approving the [m]erger, which was unfair to Gig3's public stockholders."[98] The plaintiff also avers that the defendants acted on these conflicts by depriving

---

[94] *China Agritech*, 2013 WL 2181514, at \*24 (quoting *Cent. Mortg.*, 27 A.3d at 537 n.13).

[95] *Gen. Motors (Hughes)*, 897 A.2d at 168.

[96] 268 A.3d 784 (Del. Ch. 2022).

[97] *Id.* at 800. For the sake of brevity, I at times refer to a claim concerning the impairment of stockholders' redemption rights as a "*MultiPlan* claim."

[98] Compl. ¶ 111.

stockholders of information necessary to decide whether to redeem or to invest in the combined company.[99] The essential difference between the present case and *MultiPlan* lies in the manner in which stockholders' redemption rights were allegedly compromised.

The defendants moved to dismiss the Complaint for a panoply of reasons. They assert, among other things, that the plaintiff's claims are derivative and must be dismissed under Rule 23.1 or are impermissible "holder" claims. Similar positions were considered and rejected in *MultiPlan*. Still, I address them given the defendants' insistence that a different outcome is appropriate here. The defendants' arguments fail.

I then consider the merits of the plaintiff's claims and assess the applicable standard of review. Applying the entire fairness standard, I determine that the plaintiff has pleaded reasonably conceivable breach of fiduciary duty claims against the Board and the Sponsor. The unjust enrichment claim also survives.

## A. The Plaintiff's Claims Concern Individually Compensable Harm.

As an initial matter, the plaintiff's claims are direct rather than derivative. The crux of the plaintiff's fiduciary duty claims is that the defendants' disloyal conduct deprived Gig3 public stockholders of information needed to decide whether to

---

[99] *See id.* ¶¶ 109, 112-13, 118, 122.

exercise their redemption rights.[100] The unjust enrichment claim is based on the Sponsor and Board being enriched because of that informational imbalance.[101] These harms are individually compensable, separate and distinct from any potential injury to Gig3 caused by the merger.

The defendants nonetheless characterize this case as an "overpayment" action challenging a "bad deal."[102] Their assessment is misplaced. In an overpayment claim, "the corporation's funds have been wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value."[103] In a *MultiPlan* claim, by contrast, the funds being depleted are held in trust for the SPAC's public stockholders.[104] If a stockholder's redemption right had not been manipulated and she chose to redeem her shares, she would retrieve her *pro rata* portion of the trust. Any subsequent overpayment by the SPAC—regardless of the amount—would be irrelevant.[105]

---

[100] *Id.* ¶¶ 113, 122.

[101] *Id.* ¶¶ 126-27.

[102] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss Verified Class Action Compl. (Dkt. 18) ("Defs.' Opening Br.") 25-30.

[103] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).

[104] *See MultiPlan*, 268 A.3d at 802.

[105] *See id.* at 804 n.118. Whether the SPAC overpaid for the target by $1 or $100 billion, the damages available to the plaintiff for impairment of his redemption right would remain the same.

Application of the two-pronged *Tooley* test, which considers "(1) who suffered the alleged harm" and "(2) who would receive the benefit of any recovery or other remedy," confirms the direct nature of these claims.[106]

First, Gig3 public stockholders suffered the harm pleaded in the Complaint. The plaintiff asserts that the defendants disloyally failed to provide stockholders with the information necessary to decide whether to redeem and how to vote. Because of a SPAC's distinctive structure and the absence of a meaningful vote on the merger,[107] the redemption right is the central form of stockholder protection and the focus of the harm alleged. Interference with that right produces an injury that would not run to the corporation.

Second, the recovery would accrue only to stockholders who suffered a harm to their redemption rights.[108] Any restoration of value to the Company that indirectly benefitted stockholders *pro rata* would be inapt for two reasons. The loss of value involves the public stockholders' funds held in trust, which do not belong to the Company until after redemption requests are satisfied.[109] And many stockholders who would indirectly benefit from a derivative recovery lack a redemption right.

---

[106] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[107] *See infra* notes 202-07 and accompanying text.

[108] *MultiPlan*, 268 A.3d at 803-05.

[109] *See supra* note 20 and accompanying text.

Although the redemption right was only carried by shares issued to the public in Gig3's IPO, a recovery to the corporation would be shared with various pre-merger and PIPE investors as well as other stockholders of New Lightning.[110]

Furthermore, the remedy for a direct claim brought by public stockholders would not lead to a double recovery if a derivative overpayment claim were brought by the SPAC.[111] The defendants acknowledge that this court previously recognized as much.[112] They nevertheless argue that the calculation of overpayment damages and redemption damages in this case would be the same. By the defendants' logic, damages under either theory would address whether stockholders were harmed

---

[110] *Cf. El Paso*, 152 A.3d at 1264 ("Were the [plaintiff] to recover directly for the alleged decrease in the value of the Partnership's assets, the damages would be proportionate to his ownership interest. The necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative.").

[111] *Cf. In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006) ("[I]f the plaintiffs' damages theory is valid, the directors of an acquiring corporation would be liable to pay both the corporation and its shareholders the same compensatory damages for the same injury. That simply cannot be."); *Lenois v. Lawal*, 2017 WL 5289611, at *20 (Del. Ch. Nov. 7, 2017) (holding that plaintiff's direct claims were disallowed to prevent the defendants from paying identical damages to the company and to stockholders for the same underlying behavior). The Delaware Supreme Court's decision in *J.P. Morgan* concerned an alleged disclosure violation for which no "quantifiable amount" of damages could be inferred from stockholders "individually . . . being deprived of their right to cast an informed vote." 906 A.2d at 773 (emphasis omitted). The claim here presents a different scenario: the disclosure violation is related to the stockholders' right to redeem their $10 per share investment plus interest.

[112] Defs.' Reply Br. in Supp. of Their Mot. to Dismiss Verified Class Action Compl. (Dkt. 24) ("Defs.' Reply Br.") 23; *see MultiPlan*, 268 A.3d at 804 n.118 (demonstrating the separate calculations for overpayment and redemption damages with a numerical example).

because rather than receiving something worth $10 (either cash if redeeming or a share in New Lighting if investing), they received something worth less.[113]  Not so.

In an overpayment case, damages would be based on the difference between the amount the SPAC paid for the target and the target's true value at the time of the merger (i.e., if it had been valued correctly).[114]  But the plaintiff's recovery for impairment of his redemption right would be based on the $10.10 redemption price.[115]  In the hypothetical (and unlikely) scenario where a derivative overpayment claim were brought in parallel with a *MultiPlan* claim, the corporation's damages would presumably be net of the amount owed to public stockholders in relation to their redemption rights.

## B.     The Plaintiff Does Not Advance "Holder" Claims.

The defendants next insist that the plaintiff's claims should be dismissed as "holder" claims.  A holder claim is "a cause of action by persons wrongfully induced

---

[113] Notably, the plaintiff avers that the corporation had less than $10 per share to contribute to the merger.  *See* discussion *infra* Section II.C.2.a.

[114] *See MultiPlan*, 268 A.3d at 804 n.118.

[115] *See id.*

25

to *hold* stock instead of selling it."[116] It is predicated on circumstances where a stockholder is not "forced" or "even asked" to make a decision.[117]

The plaintiff's claims are not of that ilk. The Proxy expressly stated that stockholders were being "provid[ed] . . . with the opportunity to redeem" and instructed stockholders how to complete the redemption process.[118] That the default action was to invest—that is, no physical action need be taken—does not mean a stockholder was "holding." Instead, a stockholder who opted not to redeem chose to invest her portion of the trust in the post-merger entity. This affirmative choice is one that each SPAC public stockholder must make. There is no continuation of the status quo.

The defendants argue that the Proxy did not seek stockholder action on the redemption decision because public stockholders could redeem even if they did not vote on the merger.[119] But whether stockholders were also asked to make a voting decision is of no moment. Irrespective of how they voted, Gig3's public stockholders were required "to decide whether to request that their cash be returned

---

[116] *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1132 (Del. 2016) (quoting *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003) (emphasis in original)).

[117] *In re CBS Class Action & Deriv. Litig.*, 2021 WL 268779, at *23-24 (Del. Ch. Jan. 17, 2021).

[118] Proxy at 23.

[119] *Cf. MultiPlan*, 268 A.3d at 803 (noting that stockholders were "obligated" to vote on the merger in order to redeem).

26

to them from the trust or to invest that cash in the proposed business combination."[120]

This "investment decision" is comparable to those that the Delaware Supreme Court has recognized as calls for "stockholder action," including "purchasing and tendering stock or making an appraisal election."[121]

Further, the practical reasons that prevent holder claims from being pursued on behalf of a class are not present here. Holder claims are grounded in common law fraud or negligent misrepresentation, which require proof of reliance.[122] Individual questions of justifiable reliance predominate over common questions of law or fact, making class wide treatment inappropriate.

---

[120] *Id.* at 807.

[121] *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020) (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013)). By way of imperfect analogy, a stockholder seeking appraisal may opt not to vote on a merger and nonetheless perfect her appraisal rights. *See Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs. Inc.*, 2010 WL 5276991, at *13 (Del. Ch. Dec. 17, 2010) ("In order for a dissenting stockholder to perfect his appraisal rights in the case of a long-form merger, he must either vote against the merger or not vote at all . . . ."). In the tender offer context, of course, there is no vote. *See Latesco v. Wayport*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) (discussing that a "call for stockholder action" included the "collective action problem" of asking stockholders to "tender their shares").

[122] *See CBS*, 2021 WL 268779, at *20 (discussing that holder claims cannot be brought as class claims because "individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact"); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992) ("A class action may not be maintained in a purely common law or equitable fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact.").

The redemption right, though individual in nature, created a "collective action problem" for stockholders such that it would be "impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration."[123]  Stockholders must choose to redeem or invest based upon the disclosures provided by the SPAC.  "[A] reasonable inference can be drawn that the stockholder relied upon the disclosure and that, assuming it is 'material,' any harm flowing from the stockholder's action proximately resulted from such reliance."[124]  Individual proof of reliance is unnecessary.

## C.     The Fiduciary Duty Claims Are Reasonably Conceivable.

Directors of Delaware corporations owe duties of care and loyalty to the entity and its stockholders.[125]  Those duties give rise to a duty of disclosure, the obligations of which "are defined by the context in which the director communicates."[126]  A controlling stockholder also "owes fiduciary duties to the corporation and its

---

[123] *Latesco*, 2009 WL 2246793, at *6.

[124] *CBS*, 2021 WL 268779, at *23; *see Malone v. Brincat*, 722 A.2d 5, 12 (Del. 2006) (explaining that an action for a disclosure violation does not concern reliance, causation, or quantifiable damages but rather includes "a connection to the request for shareholder action").

[125] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[126] *Dohmen*, 234 A.3d at 1168; *see Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (observing that the fiduciary duty of disclosure "is not an independent duty, but derives from the duties of care and loyalty").

minority stockholders, and it is 'prohibited from exercising corporate power . . . so as to advantage [itself] while disadvantaging the corporation.'"[127] The duties owed by the fiduciaries of a SPAC organized as a Delaware corporation are no different.[128]

The plaintiff contends that the defendants breached their fiduciary duties by disloyally interfering with Gig3 public stockholders' redemption rights.[129] But the defendants refute that their duties of care and loyalty extend to the redemption right in the first place. They insist that the plaintiff is limited to bringing a breach of contract (or quasi-contract) claim because the redemption right is provided by Gig3's charter. In that case, the plaintiff's claim would solely implicate the SPAC as the contracting party, rather than the Sponsor or Board.[130]

The plaintiff is not asserting that Gig3 breached its obligation to provide him with a redemption right. Rather, he is claiming that the defendants disloyally hindered his ability to exercise it. Gig3's charter does not speak to the actions that its fiduciaries must undertake in connection with the right. Requiring the defendants

---

[127] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) (quoting *Thorpe v. CERBCO, Inc.*, 1995 WL 478954, at *8 (Del. Ch. Aug. 9, 1995)) (emphasis omitted).

[128] *See infra* notes 149-53 and accompanying text.

[129] Compl. ¶¶ 111-13.

[130] In the defendants' view, the implied covenant of good faith and fair dealing would provide the only recourse to the plaintiff. *See* Defs.' Reply Br. 26-28.

to abide by their fiduciary duties would neither "rewrite the contract"[131] nor "undermine the primacy of contract law."[132]

The right to redeem is the primary means protecting stockholders from a forced investment in a transaction they believe is ill-conceived. It is a bespoke check on the sponsor's self-interest, which is intrinsic to the governance structure of a SPAC. It follows that a SPAC's fiduciaries must ensure that right is effective, including by disclosing "fully and fairly all material information" that is reasonably available about the merger and target to inform the redemption decision.[133] To hold otherwise would lead to the illogical outcome that SPAC directors owe fiduciary duties in connection with the "empty" vote on the merger, but not the redemption choice that is of far greater consequence to stockholders.[134]

---

[131] *Nemec v. Shrader*, 991 A.2d 1120, 1126, 1129 (Del. 2010) (addressing a claim where the "nature and scope of the [d]irectors' duties," when causing the company to exercise a right to redeem shares acquired under a stock plan agreement, were "defined solely by reference to that contract").

[132] *Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998) (addressing a claim regarding breach of a preferred stockholder's explicit rights provided for in a charter).

[133] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143, 137 (Del. 1997); *see Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) (holding that direct claims for breach of fiduciary duty arose in the context of a tender offer when it was alleged that "defendants failed to disclose all material information to the shareholders in the 14D-9 and Amended 14D-9"). Moreover, as discussed above, stockholders were collectively called upon to make a redemption decision. *See* discussion *supra* Section II.B.

[134] *See generally infra* notes 202-07 and accompanying text.

### 1. Standard of Review

The standard of review supplies the appropriate lens through which the court evaluates whether the defendants complied with their fiduciary obligations.[135] The business judgment rule, Delaware's default standard of review, presumes "that in making a business decision, the board of directors 'acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'"[136] "[T]he judgment of a properly functioning board will not be second-guessed and '[a]bsent an abuse of discretion, that judgment will be respected by the courts.'"[137]

Where the presumption of the business judgment rule is rebutted, deference is no longer afforded and a more exacting review is required. The corporate fiduciaries' actions are examined under the entire fairness standard.[138]

---

[135] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35-36 (Del. Ch. 2013) ("The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 841 (Del. Ch. 2002) ("For the equitable tort, the court evaluates the question of breach through the lens of one of several possible standards of review."); *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 275-76 (Del. 2017) (Strine, C.J., dissenting) ("[T]he lens that a judge uses"—i.e., the "burden of proof" and "standard of review"—are "supposed to influence how [s]he assesses the evidence before h[er].").

[136] *Solomon v. Armstrong*, 747 A.2d 1098, 1111 (Del. Ch. 1999) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

[137] *Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002) (quoting *Aronson*, 473 A.2d at 811).

[138] *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995) (stating that where "the presumption of the business judgment rule has been rebutted, the board of

Here, the "entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction."[139] The plaintiff pleads facts supporting two independent grounds for that conclusion. First, the de-SPAC merger with Lightning was a conflicted controller transaction. Second, a majority of the Board was not disinterested or independent.[140]

The defendants ask me to put the question of fairness to the side and focus first on whether the plaintiff has shown that the Proxy informing the redemption decision was materially false or misleading.[141] That approach would be suitable if the plaintiff had advanced a straightforward disclosure claim. But the plaintiff's allegations give rise to a single claim where the deficient disclosures are "inextricably intertwined" with the disloyal behavior that caused them.[142]

---

directors' action is examined under the entire fairness standard" (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 n.7 (Del. 1995))).

[139] *MultiPlan*, 268 A.3d at 792.

[140] *See, e.g.*, *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) ("Delaware courts will apply the most stringent level of review, entire fairness, in circumstances where: (1) properly reviewable facts reveal that the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or tainted by conflicts of interest; or (2) the plaintiff presents facts supporting a reasonable inference that a transaction involved a controlling stockholder.").

[141] *E.g.*, Defs.' Reply Br. 5-11.

[142] *MultiPlan*, 268 A.3d at 800 & n.92 (citing Jack B. Jacobs, *The Fiduciary Duty of Disclosure after* Dabit, 2 J. Bus. & Tech. L. 391, 397 (2007)).

The core thesis of the Complaint is that the defendants were incentivized to undertake a value-decreasing transaction because it led to colossal returns on the Sponsor's investment, without regard to whether public stockholders were better served by liquidation. By providing inadequate disclosures about the merger, the defendants could discourage redemptions and ensure greater deal certainty. These "quintessential Delaware concerns" would go unresolved if the court's analysis began and ended with materiality.[143]

To view the disclosures in a vacuum would evade any meaningful assessment of whether the redemption choice was manipulated to maximize the sponsor's profits at public stockholders' expense. The SPAC's fiduciaries, motivated to close a de-SPAC transaction, would not be held to account for failing to undertake the thorough and careful process their duties to stockholders require. This court cannot wear blinders where conflicts are alleged to infect the decision-making of a board majority or a transaction benefitting a controller to other stockholders' detriment. Instead, Delaware law mandates the application of entire fairness review.[144]

The defendants further argue that these misaligned economic incentives should play no role in the court's analysis because they were disclosed in the

---

[143] *In re Lordstown Motors Corp. S'holders Litig.*, 2022 WL 678597, at *4 (Del. Ch. Mar. 7, 2022) (describing similar allegations as "quintessential Delaware concerns" and not "a rebranding of securities claims about material misstatements as fiduciary duty claims").

[144] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 703 (Del. 1983).

prospectus when the plaintiff invested in Gig3 and again in the Proxy when he opted not to redeem.[145]  In other words, they believe that the plaintiff is estopped from invoking the duty of loyalty and a heightened standard of review because he implicitly assented to the conflicts.

The sole decision cited in support of this estoppel theory held that a stockholder plaintiff lacked standing to pursue derivative claims challenging an insider transaction that was disclosed in the IPO prospectus.[146]  The court addressed whether the plaintiff could demonstrate contemporaneous ownership because the terms of the challenged transaction were set before the IPO in which the plaintiff purchased stock.[147]  Nothing in that decision indicates that the plaintiff waived loyalty claims by tacitly consenting to a conflicted arrangement when investing.[148] Nor does it suggest that this court is barred from applying entire fairness if the conflicts triggering that standard of review were disclosed.

---

[145] Defs.' Opening Br. 41-42 n.6.

[146] *In re SmileDirectClub, Inc. Deriv. Litig.*, 2021 WL 2182827, at *12 (Del. Ch. May 28, 2021) ("In view of the Prospectus's thorough disclosures about the Company's plans to complete the Insider Transactions at the IPO price, 'it would seem to follow that plaintiff would be barred from suing by reason of its knowledge of the alleged wrong when it purchased the stock.'" (quoting *7547 P'rs v. Beck*, 1995 WL 106490, at *3 (Del. Ch. Feb. 24, 1995))).

[147] *Id.*

[148] *See MultiPlan*, 268 A.2d at 812.

Such an approach would be inconsistent with the fundamental principles of our law. Delaware corporate law "does not allow for a waiver of the directors' duty of loyalty."[149] And it does not exempt SPAC mergers from the application of entire fairness review to enforce that obligation.[150] Neither the nature of the SPAC nor the presence of the redemption right permits otherwise.

The Delaware General Assembly alone "has the authority to eliminate or modify fiduciary duties and the standards that are applied by this court, or to authorize their elimination or modification."[151] Whether it is wise to "create a business entity in which the managers owe the investors no duties at all except as set forth" by statute or the entity's governing documents is a "policy judgment" left to

---

[149] *Schock v. Nash*, 732 A.2d 217, 225 n.21 (Del. 1999).

[150] *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *2, *14-16 (Del. Ch. May 31, 2022) (rejecting the defendants' argument that enhanced scrutiny did not apply because the company's charter contained a provision stating that the board's decisions made "in good faith and on the basis of such information and assistance as was then reasonably available for such purpose shall be conclusive and binding upon the Corporation and its stockholders"; noting that such provisions could not "alter the directors' fiduciary obligations and the attendant equitable standards a court will apply when enforcing those obligations"); *cf. Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 243 (Del. 2001) ("By enacting a statute [8 *Del. C.* § 253] that authorizes the elimination of the minority without notice, vote, or other traditional indicia of procedural fairness, the General Assembly effectively circumscribed the parent corporation's obligations to the minority in a short-form merger. The parent corporation does not have to establish entire fairness, and, absent fraud or illegality, the only recourse for a minority stockholder who is dissatisfied with the merger consideration is appraisal.").

[151] *Totta*, 2022 WL 1751741, at *15.

that legislative body.[152]  Unless and until that occurs, a SPAC taking the Delaware

corporate form "promises investors that equity will provide the important default

protections it always has."[153]  It is not for this court to grant an exemption.

### a.  The Conflicted Controller Allegations

The plaintiff alleges that a "chain of control" allowed Katz to dominate Gig3,

its Board, and the merger with Lightning.[154]  Katz owned and controlled the Sponsor

which, in turn, controlled Gig3.  The defendants reject the characterization of the

Sponsor as a controlling stockholder because it owned less than a majority of Gig3's

pre-merger shares.[155]

A stockholder is deemed a "controlling stockholder" if "it owns a majority

interest in" the corporation or owns less than a majority but "*exercises control* over

---

[152] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 856 (Del. Ch. 2012).

[153] *Id.*; Minor Myers, *The Corporate Law Reckoning for SPACs* 1 (Aug. 2, 2022), https://ssrn.com/abstract=4095220 ("For a SPAC that has elected to organize as a corporation, in Delaware, and sold shares of common stock to the public, the core attributes of the privately-ordered bargain are deceptively simple: (1) the mandatory loyalty obligation for fiduciaries and (2) the limited ways to satisfy that obligation short of a judicial inquiry.").

[154] Compl. ¶ 6.

[155] Defs.' Opening Br. 37-38 n.5; Oral Arg. Tr. (Dkt. 39) 13-14.  By my calculation, the Sponsor held 21.76% of the pre-merger shares (5,635,000 out of a total of 25,893,479 shares).  *See* Proxy at 1, 5.  The Sponsor held 4,985,000 Initial Stockholder Shares and 650,000 common shares from the private placement units.

the business affairs of the corporation."[156] Delaware courts have long been chary of determining that minority stockholders—particularly those who are not significant blockholders—have effective control.[157] In cases where "soft" control has been found, the controller generally possesses a potent "combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes."[158]

Although the Sponsor held less than a quarter of Gig3's voting power at the time of the merger, the governance structure of the SPAC makes it reasonably conceivable that the Sponsor was its controlling stockholder.[159] The sponsor of a SPAC controls all aspects of the entity from its creation until the de-SPAC transaction. In Gig3's case, the Sponsor created the Company and incorporated it in

---

[156] *Kahn v. Lynch Commc'ns Sys, Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (emphasis in original); *see also In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018).

[157] *See In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 661 (Del. Ch. 2013) (holding that the purported controller's 27% stake and right to appoint two of ten directors was insufficient to support an inference that it exercised control); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000) (concluding that a defendant owning 46% of the outstanding stock—and the ability to purchase an additional 20%—and with the right, albeit unexercised, to appoint two of eight directors was not a controlling stockholder).

[158] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003); *see Tesla*, 2018 WL 1560293, at *19 (holding it was reasonably conceivable at the pleading stage that a 22% stockholder and CEO was a controlling stockholder where the purported controller exercised substantial influence over the corporation and board).

[159] It must be emphasized that the SPAC structure is central to this pleading-stage conclusion.

Delaware. It selected the initial Board, which would remain in place until the merger with Lightning closed.[160] The Sponsor controlled the Board through Katz who, as discussed below, had close ties to and influence over each of the directors.[161]

The Sponsor also held unrivaled authority over Gig3's business affairs.[162] Like all SPACs, Gig3 had no substantive operations before the de-SPAC merger. Its sole objective was to seek out a merger target—a process "dominated" by Katz (Gig3's Executive Chairman and CEO) and Dinu (his spouse).[163] The Sponsor, through its control of the Board, exercised power over the most crucial decision facing the Company: merge or liquidate.[164] Gig3's SEC filings acknowledge that

---

[160] Compl. ¶¶ 4, 6, 42; Prospectus at 42 (explaining that Gig3 did not "intend to hold an annual meeting of stockholders [to elect directors] until after . . . consummat[ion] of a business combination" even though this "may not be in compliance with Section 211(b) of the DGCL"); *see Voigt v. Metcalf*, 2020 WL 614999, at *14 (Del. Ch. Feb. 10, 2020) (explaining that "the ability of an alleged controller to designate directors . . . is an indication of control").

[161] *See* discussion *infra* Section II.C.1.b.

[162] *Kahn*, 638 A.2d at 1114 (describing the "threshold question" in assessing whether a minority stockholder is a controlling stockholder to be whether it "exercised control over [the company's] business affairs").

[163] Compl. ¶ 51; *see also* Proxy at 147-57.

[164] Compl. ¶ 45; *see* Prospectus at 31 ("[E]xcept as required by applicable law or stock exchange rules, the decision as to whether we will seek stockholder approval of a proposed business combination . . . will be made by us, solely in our discretion . . . . Accordingly, we may consummate our initial business combination even if holders of a majority of the issued and outstanding shares of Common Stock do not approve of the business combination we consummate.").

the Sponsor "may exert a substantial influence on actions requiring a stockholder vote."[165]

"Entire fairness is not triggered solely because a company has a controlling stockholder. The controller also must engage in a conflicted transaction."[166] Such transactions include those where the controlling stockholder receives a "unique benefit" by "extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders."[167] Here, it is reasonably conceivable that the Sponsor—and Katz through his ownership of the Sponsor—received a "unique benefit" from its ownership of the Initial Stockholder Shares and private placement units.[168]

As the defendants point out, the Sponsor was generally aligned with public stockholders in seeking out a favorable merger target. The Sponsor and public stockholders who did not redeem would receive the same stock in the post-de-SPAC

---

[165] Prospectus at 31; *see id.* at 54 ("Our initial stockholders will control a substantial interest in us and thus may influence certain actions requiring a stockholder vote."); *id.* at 110 ("Because of [its] ownership block, [the Sponsor], acting alone, may be able to effectively influence the outcome of all matters requiring approval by our stockholders."); *see also Tesla*, 2018 WL 1560293, at *19 (explaining that "public acknowledgements" of the alleged controller's "substantially outsized influence" was relevant to "the controlling stockholder inquiry when coupled with the other well-pled allegations" of control).

[166] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014).

[167] *Id.* at *13.

[168] *See MultiPlan*, 268 A.3d at 811.

entity. But the economic structure of the SPAC allowed the Sponsor to extract something uniquely valuable, at the expense of public stockholders, in two ways.

First, the Sponsor's interests diverged from public stockholders in the choice between a bad deal and a liquidation. The Sponsor would realize enormous returns on its $25,000 investment in a value-decreasing merger.[169] For example, despite the plunge in New Lightning's stock price since the merger, the Initial Stockholder Shares were worth nearly $32.7 million when this litigation was filed.[170] But if Gig3 liquidated, the Initial Stockholder Shares would be worthless. Public stockholders, by contrast, would receive their investment plus interest from the trust in a liquidation. For those stockholders, no deal was preferable to one worth less than the liquidation price.[171]

---

[169] The defendants assert that a lock-up agreement, requiring the Sponsor to refrain from selling its shares for twelve months or until the stock reached a particular target price, incentivized the Sponsor to seek out a value-increasing merger. Defs.' Opening Br. 40. Even if the lock-up agreement could be considered at this stage, I would not reach a different outcome on the motion to dismiss. It can be fairly inferred that unless Gig3 went bankrupt within a year, the value the Sponsor would receive one year after the merger would well exceed its $25,000 investment.

[170] Compl. ¶¶ 94, 96. New Lightning's stock price was $6.57 per share as of August 2, 2021. *Id.* ¶ 94.

[171] The cases relied upon by the defendants do not involve this dynamic. *See In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013) (noting that the vesting of stock options in a change of control transaction aligned directors' interests with those of stockholders and both parties would remain in their status quo positions if a transaction were not achieved); *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *13 n.64 (Del. Ch. Feb. 29, 2012) (same); *Globis P'rs, L.P. v. Plumtree Software, Inc.,* 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) (same).

Additionally, the Sponsor had an interest in minimizing redemptions after the merger agreement was signed. The merger with Lightning was conditioned on Gig3 contributing at least $150 million in cash, $50 million of which was required to come from the trust account.[172] By minimizing redemptions, the Sponsor reduced the risk that the merger would fail and increased the value of the Sponsor's interest if it closed. Thus, the Sponsor "effectively competed with the public stockholders for the funds held in trust and would be incentivized to discourage redemptions if the deal was expected to be value decreasing."[173]

These disparate incentives were not ameliorated by Gig3's single-class structure. The nature of the Sponsor's promote incentivized it to complete a merger with Lightning, even if the deal proved disastrous for non-redeeming public stockholders. That Gig3 had 11 months left to consummate a transaction does not support a conclusion otherwise.[174] Drawing all inferences in the plaintiff's favor, the Sponsor might have desired to take the money in hand and focus on the next "Gig" SPAC rather than continuing to seek a target for Gig3.

---

[172] Proxy at 16; *see also* Compl. ¶ 87.

[173] *MultiPlan*, 268 A.3d at 811; *see Crimson Expl.*, 2014 WL 5449419, at *12.

[174] *See MultiPlan*, 268 A.3d at 811 ("Time left in the completion window does not change the potential for misaligned incentives.").

### b. The Board-Level Conflicts

The standard of review also elevates to entire fairness when a complaint "allege[s] facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority."[175] Here, the Board had six members. The plaintiff must demonstrate that at least three of those directors were interested or lacked independence to support the application of entire fairness on that basis.[176]

The plaintiff adequately pleaded that Katz, through his ownership and control of the Sponsor, had a material conflict regarding the transaction with Lightning.[177] As of the merger date, the Initial Stockholder Shares had an implied market value of $39 million.[178] That represents a 155,900% return on the Sponsor's initial $25,000 investment. Irrespective of Katz's personal wealth, a windfall of that magnitude cannot easily be dismissed as inconsequential.[179]

---

[175] *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 25, 2017).

[176] *Id.* ("If a board is evenly divided between compromised and non-compromised directors, then the plaintiff has succeeded in rebutting the business judgment rule.").

[177] Compl. ¶ 6.

[178] *Id.* ¶ 96.

[179] *See Orman*, 794 A.2d at 31 (observing, in different circumstances, that "it would be naïve to say, as a matter of law, that $3.3 million is immaterial").

The remaining five members of the Board are Dinu, Miotto, Mikulsky, Betti-Berutto, and Wang.

It can be fairly inferred that Dinu shared Katz's interest in the merger.[180] But the Complaint lacks allegations of material self-interest for the other four directors. The plaintiff asserts that the directors are conflicted because they held "direct or indirect" interests in the Sponsor.[181] But he did not plead the size of those interests or any context for their materiality to the directors.[182] According to the defendants, the directors were compensated for their services in cash.[183]

Despite appearing to compensate the Board members in a way that could reduce conflicts, the Sponsor appointed directors with close ties to Katz. Directors may be found to lack independence where they are beholden to an interested party or "so under [the interested party's] influence that their discretion would be

---

[180] Compl. ¶¶ 27-28.

[181] *Id.* ¶ 43.

[182] *See DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *12 (Del. Ch. Sept. 30, 2013) (holding that a plaintiff failed to allege a fiduciary was "financially interested" in a merger based on an investment by the fiduciary's company where the plaintiff did not make "any allegations pertaining to the materiality of the . . . investment" to the fiduciary"); *In re Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002) (concluding that a plaintiff failed to plead a director was interested where the complaint referred to aggregate revenue received by an entity in which the director had an interest but did not allege how the director "may have benefited from any portion of those revenues"); *cf. MultiPlan*, 268 A.3d at 813-14 (determining, at the pleading stage, that directors were interested based on specific allegations showing the implied value of each independent director's interests in the sponsor).

[183] *See* Defs.' Opening Br. Ex. 11 ("May 27, 2020 Form 8-K") at Item 5.02.

sterilized."[184] Here, the Board members are alleged to have held multiple positions within Katz's GigCapital Global enterprise of entities:

- Dinu is Katz's spouse.[185] She is a founding managing partner of GigCapital Global.[186] She was a director of GigCapital2, Inc. (a SPAC) since March 2019 and continued in that position with UpHealth, Inc. (the post-SPAC company), acting as its CEO from August 2019 until June 2021. Dinu is also the CEO and a director of GigCapital4, Inc., GigCapital5, Inc., and GigInternational1, Inc.—all SPACs that had not undergone a de-SPAC transaction as of the filing of the Complaint. She was an executive at GigPeak, Inc.—a company Katz developed and managed—from 2008 until it was sold in 2017.[187]

- Miotto is a GigCapital Global partner.[188] He was a director of GigCapital1, Inc. (a SPAC) and remains in that position with Kaleyra, Inc. (the post-SPAC company).[189] He was also a director of GigCapital2, continuing in that position with UpHealth, and is a director of GigCapital4 and GigCapital5. He served as a director of GigPeak from its founding until its sale.[190]

---

[184] *Orman*, 794 A.2d at 24 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)); *see also In re BGC P'rs*, *Inc.*, 2021 WL 4271788, at *6 (Del. Ch. Sept. 20, 2021) ("A director 'subject to the interested party's dominion or beholden to that interested party' lacks independence." (quoting *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1023 n.25 (Del. 2015))).

[185] Compl. ¶ 27. That "[c]lose familial relationship[]" would alone "create a reasonable doubt as to [her] impartiality." *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999); *Sandys v. Pincus*, 152 A.3d 124, 130 (Del. 2016) (noting that "family ties . . . would [be] expect[ed] to heavily influence a human's ability to exercise impartial judgment").

[186] Compl. ¶ 28.

[187] *Id.*; *see* Proxy at 214-15.

[188] Compl. ¶ 28.

[189] *Id.* ¶ 29.

[190] *Id.*

44

- Mikulsky, a GigCapital Global strategic advisor, was a director of GigCapital1 and continues as a director of Kaleyra.[191] Mikulsky was the CEO and President of Endwave Corporation, a company purchased by GigPeak in 2011, after which he served as a director of GigPeak until it was sold. He was also a director of GigCapital2 until its de-SPAC transaction with UpHealth in 2021.[192]

- Betti-Berutto is GigCapital Global's Chief Technology Officer of Hardware.[193] He was a co-founder and CTO of GigPeak until its sale in 2017. He is also a director of GigCapital4 and GigInternational1.[194]

- Wang is GigCapital Global's Chief Technology Officer of Software and is a director of GigCapital6, Inc. and GigInternational1.[195] He was also a director of GigCapital1 from November 2017 until its de-SPAC merger with Kaleyra in 2021.[196]

It is reasonably inferable that these directors would "expect to be considered for directorships" in companies—such as other SPACs—that Katz launches in the future.[197] It is also rational to presume that the directors received compensation for

---

[191] *Id.* ¶ 30.

[192] *Id.*

[193] *Id.* ¶ 31.

[194] *Id.*

[195] *Id.* ¶ 32.

[196] *Id.*

[197] *See Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28, 2015) (considering allegations that the interested party had nominated directors to current board and other boards and inferring that the directors could "expect to be considered for directorships in companies the [interested party] acquire[s] in the future"); *see also BGC*, 2019 WL 4745121, at *12 (remarking that "past benefits conferred . . . may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised" (quoting *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001))).

45

these various roles, which would be accretive to their compensation in connection with Gig3. The totality of these relationships provides ample reason to doubt at the pleading stage that any of the Board members qualify as independent of Katz.[198]

c.      The Unavailability of *Corwin* Cleansing

The defendants contend that if entire fairness applies because of Board-level conflicts, the stockholder vote approving the merger subjects the transaction to business judgment review under *Corwin v. KKR Financial Holdings LLC*.[199]  My assessment below that the Proxy was materially false and misleading renders that argument meritless.[200]  It also fails, in my view, because the structure of the Gig3 stockholder vote is inconsistent with the principles animating *Corwin*.[201]

---

[198] *See In re New Valley Corp.*, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) ("The facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved.").

[199] 125 A.3d 304, 306 (Del. 2015) (holding that a fully informed, uncoerced majority stockholder vote cleanses transactions other than self-dealing transactions involving controlling stockholders); *see Larkin*, 2016 WL 4485447, at *8; Defs.' Opening Br. 41 (arguing that "even if a majority of the members of the Board were interested or not independent, the Acquisition would still be subject to business judgment rule review because . . . more than 98% of Gig3 stockholders approved the Merger in a fully informed vote based on the disclosures and the price proposed to the market").

[200] *E.g.*, *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (describing the inquiry regarding whether a stockholder vote is fully informed for purposes of triggering the application of the business judgment rule under *Corwin* to be "whether the Company's disclosures apprised stockholders of all material information and did not materially mislead them"); *see* discussion *infra* Section II.C.2.

[201] The dual protections outlined in *Kahn v. M&F Worldwide Corp.* would also be an ill fit for a de-SPAC transaction.  67 A.3d 496, 528 (Del. Ch. 2013), *aff'd*, 88 A.3d 635 (Del. 2014).  The *MFW* process was designed to protect minority stockholders from the

46

"[W]hat legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization."[202]  A stockholder vote is afforded deference under our law because stockholders are presumed to be "impartial decision-makers" with an "actual economic stake in the outcome" of the merger.[203]

Unlike the vote on a typical merger or acquisition, however, the Gig3 stockholder vote on the de-SPAC merger could not reflect its investors' collective economic preferences.  Stockholders' voting interests were decoupled from their economic interests.[204]  Gig3's public stockholders could simultaneously divest

---

retribution of a controlling stockholder engaged in a self-dealing transaction—specifically, a squeeze-out.  Those fears are not realized in a SPAC merger; public stockholders can simply redeem their shares.  This fact highlights, once again, the importance of the redemption right to a SPAC's public stockholders.

[202] *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 388 (Del. 2010)); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 416 (Del. Ch. 2010) ("Economic incentives matter, particularly for the effectiveness of a legitimizing mechanism like a majority-of-the-minority tender condition or a stockholder vote.").

[203] *Corwin*, 125 A.3d at 313-14.

[204] *See* Usha Rodrigues & Mike Stegemoller, *Redeeming SPACs* 28 (U. Ga. Sch. L. Rsch. Paper No. 2021-09, 2021), https://ssrn.com/abstract=3906196 ("[T]he vote is nearly irrelevant, because SPACs have decoupled voting and economic interest in the de-SPAC. This decoupling renders the SPAC shareholder vote—when it even occurs—a mere fig leaf.  A de-SPAC is a *fait accompli.*"); John C. Coates, *SPAC Law and Myths* 9 (Feb. 11, 2022), https://ssrn.com/abstract=4022809 (discussing the "possibility—often a reality—that many voting shareholders will redeem and exit the SPAC shortly after they vote on a deal, creating a close analogue of 'empty voting'").

themselves of an interest in New Lightning by redeeming and vote in favor of the deal. Many did. Although 98% of all Gig3 stockholders (according to the defendants) voted in favor of the merger, 29% of the public stockholders redeemed their shares.[205]

Public stockholders had no reason to vote against a bad deal because they could redeem. Moreover, redeeming stockholders remained incentivized to vote in favor of a deal—regardless of its merits—to preserve the value of the warrants included in SPAC IPO units.[206] Because this vote was of no real consequence, its effect on the standard of review is equivalently meaningless.[207]

---

[205] Defs.' Opening Br. 21 (citing April 21, 2021 Form 8-K at Item 5.07).

[206] *See* Klausner, Ohlrogge & Ruan, *Sober Look*, *supra* note 4, at 241-46 (discussing research reflecting that all stockholders who buy units in the IPO but sell or redeem their shares retain free warrants); *supra* note 19 and accompanying text.

[207] The vote could have held greater importance if stockholders' voting and economic interests had been "recoupled" by requiring redeeming stockholders to vote against the deal. *See* Usha Rodrigues & Michael Stegemoller, *Disclosure's Limits*, 40 Yale J. Reg. 37, 42-43 (2022) (proposing that stockholders must vote against a merger in order to exercise their redemption right and arguing that "[r]ecoupling the vote with the redemption right can help ensure that good deals go forward—and bad deals don't"); Holger Spamann & Hao Guo, *The SPAC Trap: How SPACs Disable Indirect Investor Protection*, 40 Yale J. Reg. 75, 79 (2022) (recounting that the SPACs of the 1990s and early 2000s "required investors to vote against the de-SPAC if they wanted to redeem," which provided an "indirect investor protection defense" because "the acquisition would not go through if it was a bad deal for non-redeeming SPAC shareholders"). This, of course, assumes that the vote otherwise satisfied *Corwin*, including the requirement that it be fully informed. But in that case, it would seem that stockholders would also have been given a fair opportunity to redeem and there would not be a reasonably conceivable *MultiPlan* claim.

48

## 2. The Fairness Analysis

Under the entire fairness standard, the defendant fiduciaries will bear the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its [stockholders]."[208] "Although fairness has two component parts—price and process—the court must make a 'single judgment that considers each of these aspects.'"[209]

The fact intensive nature of this inquiry "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss."[210] But "[e]ven in a self-interested transaction," a plaintiff "must allege some facts that tend to show that the transaction was not fair."[211] Dismissal may be appropriate if the defendants demonstrate that the challenged act "was entirely fair based solely on the allegations of the complaint and the documents integral to it."[212]

In *Weinberger v. UOP, Inc.*, the Delaware Supreme Court explained that compliance with the duty of disclosure is included within the fair dealing facet of

---

[208] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006).

[209] *BGC*, 2022 WL 3581641, at *42 (Del. Ch. Aug. 19, 2022) (quoting *Cinerama*, 663 A.2d at 1139-40).

[210] *Orman*, 794 A.2d at 21 n.36.

[211] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

[212] *Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014).

49

the test.[213]    Because "[m]aterial information" was withheld from minority stockholders "under circumstances amounting to a breach of fiduciary duty," the court concluded that the merger did "not meet the test of fairness."[214]  The directors' lack of candor was considered in the broader context of their unfair dealing, including "the absence of any attempt to structure th[e] transaction on an arm's length basis" and the "obvious conflicts" involved.[215]  The court viewed complete disclosure as a means of ensuring fair play but assessed the adequacy of the disclosures against the backdrop of the overall transaction.

In keeping with that guidance, this court held in *MultiPlan* that the plaintiffs had stated viable claims under the entire fairness standard not only due to the conflicts in the de-SPAC merger but also because the defendants "failed, disloyally, to disclose information necessary for the plaintiffs to knowledgeably exercise their redemption rights."[216]  That opinion explicitly did not address "the validity of a

---

[213] 457 A.2d at 711 (describing "fair dealing" as including the question of "how the approvals of the directors and the stockholders were obtained").

[214] *Id.* at 703; *see also In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 29 (Del. Ch. 2014) (concluding that a "disclosure issue on which the plaintiffs received summary judgment provide[d] some evidence of unfairness"); *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104-05 (Del. 1985) (overruling a "narrow interpretation" of *Weinberger* focused solely on "allegations of non-disclosures or misrepresentations" because the "mandate of fair dealing does not turn solely on issues of deception" but includes "broader concerns respecting the matter of procedural fairness").

[215] *Weinberger*, 457 A.2d at 710-11.

[216] 268 A.3d at 816.

hypothetical claim" premised solely on the conflicts inherent in a SPAC structure if public stockholders "in possession of all material information" had chosen "to invest rather than redeem."[217] Rather, it evaluated the "core, direct harm" caused by the action or inaction of conflicted fiduciaries that constrained the informed exercise of the redemption right.[218]

The defendants argue that this case presents the theoretical scenario contemplated in *MultiPlan* because the Proxy contained all material information. Not so.

The plaintiff has provided "some facts" that public stockholders' redemption decisions were compromised by the defendants' unfair dealing in two primary ways.[219] The first concerns the failure to disclose the cash per share that Gig3 would invest in the combined company. The second relates to the incomplete disclosure of the value that Gig3 and its non-redeeming stockholders could expect to receive in exchange.

Both pieces of information would be essential to a stockholder deciding whether it was preferable to redeem her funds from the trust or to invest them in New Lightning. Gig3's public stockholders knew that if they redeemed, they were

---

[217] *Id.*

[218] *Id.*

[219] *Solomon*, 1995 WL 250374, at *5.

promised $10 per share plus interest. They were given incomplete information about what they would receive if they instead opted to invest.

### a.  What Gig3 Was Investing

The Board was under an "affirmative duty" to provide "materially accurate and complete" information to stockholders in connection with the redemption choice and merger vote.[220]  The Proxy indicated that the merger consideration to be paid to Lightning stockholders consisted solely of Gig3 stock valued at $10 per share.[221]  If non-redeeming stockholders were exchanging Gig3 shares worth $10 each, they could reasonably expect to receive equivalent value in return.[222]

According to the Complaint, however, the amount of net cash per share to be invested in New Lightning was not $10.[223]  It was instead less than $6 per share after

---

[220] *Feldman v. Cutaia*, 2006 WL 920420, at *8 (Del. Ch. Apr. 5, 2006).

[221] Proxy at Cover Page, A-2 (defining "Aggregate Closing Merger Consideration" to mean "a number of shares of GigCapital3 Common Stock equal to the quotient of (a) the Aggregate Closing Merger Consideration Value divided by (b) $10.00").

[222] *See* Klausner, Ohlrogge & Ruan, *Sober Look*, *supra* note 4, at 287-88 (explaining that in a de-SPAC transaction, the target negotiates an exchange in which its stockholders will "give up a fraction of their company roughly equal to the value of the SPAC shares they will receive, and the primary value of a SPAC is its cash").

[223] Compl. ¶¶ 19, 56; *see In re P3 Health Grp. Hldgs., LLC*, 2022 WL 16548567, at *19 (Del. Ch. Oct. 31, 2022) (finding it reasonably conceivable that a contractual party's right to a priority distribution was breached by the company valuing distributed SPAC shares at $10, based on the observation that "the value of SPAC equity when a de-SPAC merger takes place is materially less than $10 per share" (citing Klausner, Ohlrogge & Ruan, *Sober Look*, *supra* note 4, at 232, 246, 253)).

accounting for considerable dilution.[224] Because the Proxy allegedly misstated and obfuscated the net cash—and thus the value—underlying Gig3's shares, public stockholders could not make an informed choice about whether to redeem or invest.[225]

Gig3's sole asset at the time of the Proxy—i.e., before redemptions—was cash. That included funds in the trust account (about $202 million) and funds to be received at closing in exchange for shares pursuant to the PIPE agreement ($25 million).[226] To determine net cash per share, costs would be subtracted from that total cash (about $227 million) before dividing by the number of pre-merger shares.[227]

$$\text{Net Cash per Share} = \frac{\text{Cash} - \text{Costs}}{\text{Pre-Merger Shares}}$$

---

[224] *See* Compl. ¶ 56.

[225] *See O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999) ("To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false.").

[226] Oral Arg. Tr. 82; *see* Proxy at 107. Redemptions would further dilute equity and dissipate cash. The extent of that dilution was not, however, known at the time of the Proxy.

[227] *See* Oral Arg. Tr. 75-93; *see also* Michael Klausner, Michael Ohlrogge & Harold Halbhuber, *Net Cash Per Share: The Key to Disclosing SPAC Dilution*, 40 Yale J. Reg. 18, 24-30 (2022) (describing that costs include cash expenses, the value of warrants, and the value of other equity derivatives and that pre-merger shares include public shares, founder shares, and PIPE shares).

The plaintiff asserts that the costs to be subtracted from the cash component of the numerator would include: (1) transaction costs, including deferred underwriter fees ($8 million) and financial advisory and other fees ($32 million);[228] (2) the market value of public warrants at the time of the Proxy (about $38 million);[229] (3) the value of the warrants in the private placement units and given to Note holders; and (4) the value of the Notes' conversion feature.[230] The denominator—pre-merger shares—would consist of: (1) public shares issued in the IPO (20 million); (2) the Initial Stockholder Shares (about 5 million); (3) the Insider Shares (15,000); (4) shares to be issued at closing pursuant to the PIPE agreement (2.5 million); and (5) shares issued as part of the private placement units (about 240,000).[231] Using these inputs and the above formula, the plaintiff calculates Gig3's net cash per share at the time the Proxy was filed to be about $5.25 per share.[232]

---

[228] Oral Arg. Tr. 82.

[229] This figure values the 15 million public warrants at $2.53 per warrant, which was the average trading price the week before the Merger announcement. *Id.* at 78, 116. Per SEC guidance, the public warrants are treated as a current liability. *See Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")*, SEC (Apr. 12, 2021), https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs.

[230] Because the value of the third and fourth factors could not be determined based on the information in the Proxy, the plaintiff was unable to calculate their dilutive effects. *See* Oral Arg. Tr. 83-85. Accordingly, the plaintiff argues its calculated net cash per share value is an overestimate. *See id.*

[231] *See id.* at 75-76.

[232] *Id.* at 83; Compl. ¶ 11. At this stage, I do not assess the accuracy of the plaintiff's inputs in reaching a figure of $5.25. For example, I accept the plaintiff's assertion that the public

54

Accepting the plaintiff's allegations as true, the sizeable difference between the $10 of value per share Gig3 stockholders expected and Gig3's net cash per share after accounting for dilution and dissipation of cash is information "that a reasonable shareholder would consider . . . important in deciding" whether to redeem or invest in New Lightning.[233] If Gig3 had less than $6 per share to contribute to the merger, the Proxy's statement that Gig3 shares were worth $10 each was false—or at least materially misleading.[234] Moreover, Gig3 stockholders could not logically expect to receive $10 per share of value in exchange.[235]

---

warrants should be valued according to their market price and included in the numerator. *Cf.* Oral Arg. Tr. 91-92 (acknowledging that the "costs [of the warrants] could be reflected in the denominator of the fraction rather than the numerator"). I also am not endorsing a specific formula or methodology for calculating net cash per share. The plaintiff concedes that different companies could take different approaches. Using any reasonable method of calculating net cash per share, however, this information was not fully or accurately disclosed in the Proxy.

[233] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985); *see Zirn v. VLI Corp.*, 681 A.2d 1050, 1057 (Del. 1996) (discussing that, in the context of stockholders deciding whether to tender or retain shares, "any misstatement . . . which misled the stockholders concerning the value of the company would necessarily be material").

[234] Whether a SPAC has disclosed all material information regarding the cash per share it would invest in the combined company is a fact dependent analysis. Each SPAC's potential dilution and dissipation of cash varies depending upon, among other factors, the number of warrants, the size of the PIPE, and the amount of advisor and other fees. Here, it is reasonably conceivable that the Proxy was materially misleading because the Complaint alleges significant dilution and dissipation of cash that starkly contrasts with the Proxy's attribution of $10 to each Gig3 share. *See* Compl. ¶ 63.

[235] *See id.* ¶ 57.

### b.     What Gig3 Was Receiving

The second category of alleged disclosure violations concerns the value that stockholders would receive in a merger with Lightning. The plaintiff avers that because Gig3 was not worth $10 per share, Lightning's stated worth was commensurately overstated.[236] The value that Gig3 obtained in the merger would be highly relevant to stockholders' investment decisions. But according to the Complaint, the Board "accepted" an "inflated valuation" for Lightning built on unrealistic revenue and production projections and passed this misinformation along to stockholders.[237] The Proxy was silent as to Lightning's true prospects.

Gig3's Proxy reported that Lightning's annual revenues were projected to increase by over 22,100% in five years, from $9 million to over $2 billion.[238] It also stated that Lightning's annual gross profits were expected to rise from zero to more than $500 million over the same time period.[239] These projections assumed that Lightning would ramp up its production capacity dramatically from fewer than 100 vehicles delivered in 2019 and 2020 combined to 20,000 vehicles a year by 2025.[240]

---

[236] *E.g.*, *id.* ¶ 80.

[237] *Id.* ¶ 63.

[238] *Id.* ¶ 66.

[239] *Id.*

[240] *Id.* ¶¶ 68, 79.

The disclosure of the projections does not, by itself, imply that the defendants failed to inform the exercise of stockholders' redemption rights. They are obviously forward-looking and qualified by cautionary language.[241] The Proxy explained that the projections were prepared by Lightning management "for internal use and not with a view toward public disclosure" and were disclosed "because they were made available to [Gig3] and [its] Board in connection with their review of the proposed [merger]."[242]

The problem is that Lightning's lofty projections were not counterbalanced by impartial information.[243] Stockholders were kept in the dark about what they could realistically expect from the combined company. Gig3 did not, for example, tell investors that Lightning's business would be difficult to scale because it built highly customized vehicles in small batches.[244] The Complaint alleges that the

---

[241] Proxy at 162-63. The plaintiff is not asserting a fraud claim.

[242] *Id.* at 162-63; *see City of Miami Gen. Emps. v. Comstock*, 2016 WL 4464156, at *12 (Del. Ch. Aug. 24, 2016) (rejecting a disclosure claim against directors concerning financial estimates prepared by the merger counterparty because "[a]mending or supplementing those figures with other estimates that were not presented to [the company] would misstate the information that [the company] actually received from [the counterparty]").

[243] *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding that the defendants violated their duty of disclosure when they disclosed a "floor value, but not an equally reliable 'ceiling' value" because "full disclosure . . . was a prerequisite"); *Maric Cap. Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1177-78 (Del. Ch. 2010) ("Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion.").

[244] Compl. ¶ 79.

Board had good reason to question Lightning's future capabilities.[245] Yet the Proxy was silent.[246]

"To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials."[247] The phrase "reasonably available" is not meaningless. It sets out a baseline expectation that directors have undertaken a sufficient inquiry for material information. The Complaint alleges that this standard was not met because the Board was incentivized to turn a blind eye to Lightning's problems and close the deal.[248]

The nature of Lightning's business model was "knowable" through the sort of diligence and analysis expected of the board of a Delaware corporation undertaking a major transaction.[249] It can be inferred that the defendants knew (and should have disclosed) or should have known (but failed to investigate) that Lightning's

---

[245] *Id.* ¶ 64.

[246] The Proxy cautioned, for example, that Lightning is "an early stage company with a history of losses" that "expects to incur significant expenses and continuing losses for the foreseeable future." Proxy at 53-54. But the defendants "are not excused from disclosing material facts" simply because general "risk factors" were listed. *Pfeffer*, 965 A.2d at 686-87; *see Lynch*, 383 A.2d at 281 (stating that the duty of disclosure is not fulfilled by technically correct, generalized statements).

[247] *Pfeffer*, 965 A.2d at 686 (quoting *O'Reilly*, 745 A.2d at 926).

[248] Compl. ¶¶ 20, 23, 64, 66-72.

[249] *Pfeffer*, 965 A.2d at 687 (quoting *IOTEX Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. 1998)).

production would be difficult to scale in the manner predicted.[250]  In either event, it is reasonably conceivable that the Board deprived Gig3's public stockholders of an accurate portrayal of Lightning's financial health.  As a result, public stockholders could not fairly decide whether it was preferable to redeem for $10 plus interest or to invest in a risky venture.

*          *          *

The plaintiff has sufficiently pleaded that the Proxy contained material misstatements and omitted material, reasonably available information.  I therefore cannot conclude that the transaction was the product of fair dealing.[251]

The Complaint provides additional grounds for that assessment.  The merger negotiations were directed by Katz and Dinu—the two individuals who arguably stood to gain the most in a value-destructive deal.[252]  The Board's advisors, Nomura and Oppenheimer, had large stakes in 243,479 private placement shares that would be worthless and $8 million of contingent compensation that would not be realized if Gig3 failed to merge.[253]  The Board did not obtain a fairness opinion or even an

---

[250] Compl. ¶¶ 79-80.

[251] *See Weinberger*, 457 A.2d at 710-11.

[252] *See Cinerama*, 663 A.2d at 1173 ("The independence of the bargaining parties is a well-recognized touchstone of fair dealing.").

[253] Compl. ¶ 52; *see MultiPlan*, 268 A.3d at 818.

informal presentation on the fairness of the transaction—not to mention one considering the effect of the Sponsor promote.[254]

Unfair price can be inferred from the allegation that public stockholders were left with shares of New Lightning worth far less than the $10 per share redemption price.[255]

These matters may ultimately not support a finding of unfairness. At present, however, they provide some evidence that the Board failed to live up to the standard

---

[254] Delaware courts have stated that there is no duty to obtain a fairness opinion. In *Crescent/Mach I Partners, L.P. v. Turner*, for example, the court held that the director defendants' approval of a fairness opinion did not "rise[] to the level of grossly negligent conduct that would deprive them of the benefit of the business judgment rule." 846 A.2d 963, 985 (Del. Ch. 2000). The court remarked that "fairness opinions prepared by independent investment bankers are generally not essential, as a matter of law, to support an informed business judgment." *Id.* at 984. Nevertheless, it observed that the directors obtained an evaluation of the fairness of the merger consideration "from an investment banking firm" that was not conflicted, relied on that fairness opinion "to make an informed decision on whether or not to consummate the merger," and disclosed it in the proxy statement. *Id.* at 984-75.

In *Houseman v. Sagerman*, the plaintiffs relied on the failure to obtain a formal fairness opinion in claiming that the board "knowingly and completely failed to undertake a reasonable sales process" under *Revlon*. 2014 WL 1600724, at *7 (Del. Ch. Apr. 16, 2014). The board "considered the expense of obtaining a fairness opinion relative to the overall transaction value" but chose to engage an independent financial advisor to aid in diligence and provide "an informal opinion" that the merger price was within a range of reasonableness. *Id.* The court concluded that the directors did not act in bad faith since they undertook a reasonable process and determined "that, due to the relative expense, it was not in the Company's best interest to obtain a fairness opinion." *Id.*

In both *Turner* and *Sagerman*, the disinterestedness and independence of the directors were not in dispute. The boards undertook some efforts to assess the fairness of a transaction. They did so in reliance on independent advisors. The facts alleged here are markedly different.

[255] *E.g.*, Compl. ¶¶ 21-22, 58, 95-96, 120.

of conduct demanded of it. The benefit of a developed factual record is needed to make a definitive assessment of fairness. The defendants will bear that burden at trial.

### 3. Exculpation

Gig3's charter contains an exculpatory provision that eliminated director liability for breaches of the duty of care.[256] A plaintiff seeking monetary damages from a director must state a claim for breach of the duty of loyalty, "regardless of the underlying standard of review for the board's conduct."[257] To do so, the plaintiff must plead "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[258]

The Complaint sufficiently pleads that each of the Board members was either self-interested in the merger or acted in a manner that advanced the interests of the Sponsor and Katz to the public stockholders' detriment. The plaintiff's claims

---

[256] Charter § 8.1.

[257] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1175-76 (Del. 2015).

[258] *Id.* at 1179-80.

against the Board are also "inextricably intertwined with issues of loyalty."[259]  As a result, those claims are not exculpated.

### D.     The Unjust Enrichment Claim Is Reasonably Conceivable.

Count Three is a claim for unjust enrichment against the Sponsor and the Board.  Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[260]  The elements of unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."[261]

The Complaint pleads adequate facts to satisfy these elements.  It alleges that the defendants were "unjustly enriched" by the disloyal conduct described in Counts One and Two, which impoverished Gig3 public stockholders who were unable to exercise their redemption rights with the benefit of all material information.[262]  The enrichment and impoverishment described by the plaintiff are also related.  By providing inadequate disclosures about the amount of net cash available to Gig3 in

---

[259] *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del. 2001).

[260] *Schock*, 732 A.2d at 232 (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (1973)).

[261] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).

[262] Compl. ¶¶ 126-27.

the merger and Lightning's prospects, the defendants could discourage redemptions and ensure greater deal certainty. As a remedy, the plaintiff seeks disgorgement of the unjust profits realized by the defendants to be recouped by the affected stockholders.[263]

This claim turns, in large part, on the same allegations as the fiduciary duty claims. If the plaintiff prevails on his fiduciary duty claims, he will similarly succeed in proving unjust enrichment. Although he cannot obtain a double recovery, "[o]ne can imagine . . . factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims" against the same defendants.[264] The unjust enrichment claim therefore survives along with the fiduciary duty claims.

## III. CONCLUSION

The defendants' motion to dismiss is denied. The Complaint states reasonably conceivable claims against the defendants in Counts One, Two, and Three. The standard of review is entire fairness with the defendants bearing the burden of persuasion at trial.

---

[263] *Id.* ¶ 128.

[264] *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010); *see Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 592 (Del. 2015) (concluding that it was reasonably conceivable the plaintiff could recover on an unjust enrichment claim where it stated a claim for breach of fiduciary duty on the same, "duplicative" allegations).